IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NORTH CAROLINA
CHARLOTTE DIVISION
DOCKET NO. 3:04CR100-MU

FILED
CHARLOTTE, N. C.

DEC 6 2005

U. S. DISTRICT COURT
W. DIST. OF N. C.

| | |
|---|---|
| UNITED STATES OF AMERICA ) | |
| ) | **MEMORANDUM AND RECOMMENDATION** |
| v. ) | |
| ) | **AND ORDER** |
| ISAAC EUGENE ASBURY, ) | |
| ) | |
| Defendant. ) | |

**THIS MATTER** is before the Court on Defendant's "Motion To Suppress and Memorandum of Law" (document #6) filed September 28, 2005; and the "Government's Response to Defendant's Motion to Suppress Evidence" filed October 27, 2005. Following a suppression hearing conducted by the undersigned on Thursday, November 10, 2005, supplemental briefing was required on whether a traffic stop can be legally conducted based on reasonable suspicion that a car may have been involved in the commission of crimes <u>six and twelve days earlier</u> (<u>see</u> "Government's Supplemental Response ... " filed November 30, 2005).

For the reasons stated below, the undersigned will respectfully recommend that Defendant's Motion To Suppress be **GRANTED**.

### I. FACTUAL BACKGROUND AND FINDINGS

The facts relevant to the Defendant's Motion To Suppress are more complex and attenuated than most, beginning with the July 9, 2003 investigation of a July 3, 2003 robbery of a Winn Dixie store in Newton, North Carolina. Although the Government's Response and the Government's Supplemental Response (filed <u>after</u> the hearing) both state that "Newton Police had evidence that

a Ford Excursion vehicle was used during the robbery," law enforcement testimony at the suppression hearing was far less clear and unequivocal than that. Charlotte Mecklenburg Police Department Detective Rick Andringa, the Government's first witness, simply testified that he "understood" that "someone" had seen the vehicle near the store around the time of the July 3 robbery, and that "someone" had recorded a "partial" license plate number (consistent with the Defendant's plate number) on a vehicle seen near the scene of the robbery of a Winn Dixie in Lincolnton, North Carolina six days earlier (on June 27, 2004). Lt. Dale Lafone of the Newton Police Department, the Government's second witness, testified that he "understood" a complete tag number was reported by a witness in Lincolnton, that the tag came back as registered to the Defendant, and that a criminal record check led to the discovery that the Defendant had a prior robbery conviction. However, Lt. Lafone readily conceded that he had no knowledge of what was "suspicious" about the Defendant's vehicle, or even who might have been driving it, on June 27, 2003. The Government's third witness, Lt. Bruce Prestwood, also with the Newton Police Department—the only other witness to testify about the basis of law enforcement "suspicion" prior to the traffic stop on July 9, 2003—testified that he "understood" a North Carolina Department of Motor Vehicles Officer had recorded the Defendant's license tag number in Lincolnton and that it had been recorded approximately 30 minutes prior to the June 27 robbery, but then readily conceded on cross-examination that on July 9, 2003 (the date of the contested traffic stop) that he did not suspect the Defendant of any criminal activity and, in fact, that there was "no reasonable or articulable suspicion of criminal activity" (emphasis added).

With that contradictory and equivocal evidentiary base and nothing more, these three law enforcement officers drove to the Defendant's residence--1915 Saffron Court in Charlotte--on July

9, 2003 (six days after the second robbery and twelve days after the first robbery) and observed his vehicle parked in the driveway. When no one answered the door the officers did exactly what they should have done: they placed one of their business cards in the door and left.

About an hour later the officers observed the Defendant's vehicle, a Ford Excursion, being driven in or near his neighborhood. Detective Andringa, who was driving an unmarked vehicle, did two things in response: one proper and the other clearly improper. First, he began to follow the Defendant's vehicle (which was entirely proper), and second, he radioed a uniformed officer in a marked vehicle and instructed him to conduct a vehicle stop (which, in the absence of reasonable and articulable suspicion, was clearly improper).

AUSA Robert Gleason characterizes Detective Andringa's perception of what followed as the Defendant "attempting to loose [sic] him by making a number of turns and driving through residential neighborhoods," and asks the Court to find this alone a sufficient basis for an investigative stop. However, at no time did any of the three law enforcement witnesses in the unmarked car, or the uniformed officer who conducted the traffic stop as instructed, observe the Defendant violate the law, even a minor traffic law. Indeed, Officer Scott Miller, the uniformed officer who conducted the traffic stop, testified that the <u>only</u> reason he stopped the Defendant was because he was told by Detective Andringa to do so and, in fact, explicitly testified that, based on what he observed in the Defendant's driving, that he had <u>no</u> reasonable or articulable suspicion of unlawful activity on the Defendant's part.

Once the Defendant was stopped on July 9, 2003, Officer Miller observed what he recognized to be the end of the barrel of a gun lying in the front seat under a CD case. Believing that the gun was sufficiently "concealed" to violate state law, and aware that the Defendant was a convicted

3

felon, the officer seized the gun and the Defendant was arrested. Shortly thereafter, the Defendant told the officers that the gun belonged to his wife, that he had been teaching her to shoot, that he forgot it was in the car until he noticed he was being followed, and that he knew as a convicted felon he could not lawfully possess a gun.

What was probably an unlawful traffic stop, as explained further below, was followed by even more dubious police conduct. Indeed, the U.S. Attorney's Office has conceded that the unwarned statements which resulted <u>should</u> be suppressed, if, of course, this case makes it to trial.

What transpired next was, quite frankly, astounding to the undersigned; the Defendant was taken <u>in custody</u> to the Charlotte-Mecklenburg Law Enforcement Center, placed in an interview room, and confronted and interviewed by the two Newton Police Officers about the two Winn Dixie robberies--all without ever being advised of his <u>Miranda</u> rights. When asked on cross-examination how it was they thought they could legally conduct a custodial interrogation without informing the Defendant of his <u>Miranda</u> rights, the officers (Lafone and Prestwood) lamely, if not cynically, testified that they did not think they were required to advise the Defendant of his rights because the interrogation was brief, and because at that point only "the vehicle," not the Defendant who owned it, was "suspect." In short, as the Government appears to realize--by agreeing to "self-suppress" statements during this unlawful custodial interview--there is no remotely acceptable explanation for this blatant breach of the Defendant's clearly established constitutional rights.

Part of what the Defendant told the officers during his unconstitutional, unwarned custodial interview on July 9, 2003 was that he was willing to give a statement about the subject Winn Dixie robberies, but only if he was granted immunity from prosecution in writing. In response, at a later date the Newton officers sought and received written promises of immunity (from the prosecutors

4

in Newton and Lincolnton), and the Defendant kept his commitment by providing the name of the "gun man" who entered the stores and by admitting that he was the "getaway driver" in both instances.

On July 9, 2003, several hours after the Newton Police officers completed their unlawful interrogation and returned to Newton, Detective Andringa contacted detectives with the Charlotte Mecklenburg Police Department and advised them that he had "a large black male" in custody who might be the individual who had committed a robbery and murder at a Ci Ci's Pizza restaurant in Charlotte sometime prior to that date. Detective Linda Holmes testified at the suppression hearing that she responded to that call about 4:00 p.m. on July 9, 2003, asked if the Defendant had been Mirandized, and when she was told he had not, advised him of his Miranda rights herself. Although the Defendant waived his Miranda rights, he denied any involvement in the Ci Ci Pizza incident, and Detective Holmes terminated the interview and left.

The Defendant's charges remained in state court until the federal Government adopted the case, charging him on April 28, 2004 with being a felon in possession of a firearm (during the July 9, 2003 traffic stop). The Government's only other witness at the suppression hearing, Charlotte-Mecklenburg Detective John Kyle, testified that on May 4, 2004 he assisted in the Defendant's federal arrest; that he and Special Agent Nathaniel Jones (of the Bureau of Alcohol, Tobacco, Firearms, & Explosives) Mirandized and interviewed the Defendant at the Law Enforcement Center following his arrest; and that the Defendant confessed to committing two additional robberies, namely the robberies of Have A Nice Day Café, located at 314 North College Street in Charlotte, on or about June 15, 2003, and of Mythos, a night club located at 300 North College Street in Charlotte, on or about December 15, 2003.

The Defendant alleges quite a different version of the May 4, 2004 custodial interrogation. Specifically, he alleges that he agreed to speak to Detective Kyle about the Winn Dixie robberies only because he had been granted immunity from prosecution for those offenses; and that he initially denied any involvement in the two robberies for which he is currently charged, but changed his mind and confessed after Detective Kyle told him "that the immunity the State gave him did not apply to the federal government and that [he] would be charged with the Winn Dixie robberies if he did not confess to [the Have A Nice Day Café and Mythos robberies, with which he is currently charged]."

The Government's only evidence at the suppression hearing in response to these very serious and substantive allegations was Detective Kyle's brief denial that no threats were made prior to the Defendant's confession. Detective Kyle did admit that he spoke with the Defendant on May 4 about the difference between state and federal prosecution--although his recollection was that it was in the context of the Defendant's expressed desire to spend all of "his time" in federal custody rather than being "bounced" between the state and federal systems.

The undersigned does not find Detective Kyle's testimony on this point to be credible, particularly in light of the fact that the federal charges which resulted carry a <u>de facto</u> life sentence (50 years for the two firearms charges plus whatever sentence is imposed should the Defendant be convicted of the two robberies, charged as Hobbs Act violations). In any event, it is clear that these charges, contained in a Superseding Bill of Indictment returned December 14, 2004, were the direct result of the May 4, 2004 interrogation, and that the Winn Dixie robberies were not charged, but the two robberies to which the Defendant confessed on May 4 were.

6

## II. CONCLUSIONS OF LAW

### A. The Traffic Stop and Statements on July 9, 2003

It is well settled that a vehicle stop is permitted only upon reasonable and articulable suspicion of criminal conduct. See, e.g., United States v. Arvizu, 544 U.S. 266, 273-75 (2002)(approving vehicle stop based on reasonable suspicion); United States v. Jones, 242 F.3d 215, 218-19 (4th Cir. 2000)(vehicle stop based on uncorroborated anonymous tip, that is, on less than "reasonable suspicion," held unconstitutional, suppressing evidence and vacating conviction); United States v. King, 119 F.3d 290, 293-94 (4th Cir. 1997); and United States v. Hassan El, 5 F.3d 726, 729 (4th Cir. 1993).

As set forth in Section I, the Government's evidence is wholly lacking in its attempt to establish "reasonable suspicion" for the July 9, 2003 traffic stop. Indeed, as noted above, the officer who conducted the traffic stop testified that he was aware of no reasonable and articulable suspicion to justify the stop, and that in fact his only basis for the stop was the instruction he had received from Detective Andringa. And as also noted, Lt. Lafone testified that he had no knowledge of what was "suspicious" about the presence of the Defendant's vehicle in Newton or Lincolnton or even of who might have been driving it, and Lt. Prestwood explicitly testified on cross-examination that he did not suspect the Defendant of any criminal activity as of July 9 and conceded that there was "no reasonable or articulable suspicion of criminal activity" at that time.

The Government's Supplemental Response appears to recognize the weakness of the legal and factual basis for the July 9, 2003 traffic stop, candidly conceding that no cases were found which would justify an investigative stop based on reasonable suspicion of criminal activity six and twelve days earlier and, in fact, that the only case Mr. Gleason found on point in his post-hearing research

7

(a published decision from the District of Alaska) held to the contrary. However, rather than conceding that the traffic stop was not justified, Mr. Gleason now argues that "Detective Andringa developed an articulable and reasonable suspicion to conduct the traffic stop while following defendant's vehicle" (Government's Supplemental Response at p. 2).

As we say in the South, this is "a dog that won't hunt" for several reasons. First and foremost, the uncontroverted testimony is that the Defendant violated no law, not even a minor traffic regulation; he simply made various turns before he was stopped--near a house where he admittedly had an acquaintance (sufficiently close to allow him to leave his car there following his arrest). It is well settled that simply walking away from the police--or here, by implication, driving away from police--is insufficient to establish "reasonable suspicion." See, e.g., Illinois v. Wardlow, 528 U.S. 119, 124 (2000)("unprovoked flight," standing alone, insufficient to establish "reasonable suspicion"); Florida v. Bostick, 501 U.S. 429, 437 (1991)("refusal to cooperate, without more" does not constitute reasonable suspicion); and Florida v. Royer, 460 U.S. 491, 498 (1983)(an individual who is approached by the police has a right to ignore police and "go about his business"). Accord United States v. Sprinkle, 106 F.3d 613, 618-19 (4th Cir. 1997)("reasonable suspicion" must include "particularized evidence that ... criminal activity is afoot," finding government's showing inadequate).

The Government's argument is also betrayed by the clear testimony that Detective Andringa ordered the traffic stop immediately upon spotting the Defendant's vehicle before any of the "evasive" turns occurred, which Mr. Gleason now asks the Court to find constitute an adequate basis for the stop. And finally, as noted above, the Government's position is directly contradicted by its own witnesses, including the uniformed officer tasked with conducting the vehicle stop itself.

8

For these reasons, the immediate fruit of the stop, that is, the firearm seized on July 9, 2003 and any statements made following the unlawful stop and arrest must be suppressed. On the latter point (suppression of statements following unlawful arrest), see, e.g., United States v. Brown, 401 F.3d 588, 597-98 (4th Cir. 2005)(affirming suppression of firearm and the defendant's statements as "fruits" of unlawful arrest).

### B. Statements Following May 4, 2004 Arrest.

The statements following the Defendant's May 4, 2004, that is, his confession to the robberies of Have A Nice Day Café and Mythos charged in the Superceding Bill of Indictment, should also be suppressed for three reasons. First, they are a direct result of the unlawful stop and arrest on July 9, 2003, that is, but for the unlawful traffic stop and seizure of the firearm, there would have been no federal arrest or interrogation. Second, there is a clear continuity between deliberate and intentional police error (the unlawful stop and arrest followed by the unwarned, equally unlawful custodial interrogation) and the subsequent warned statements, which together constitute a "question first" strategy which should not be permitted. And third, the Government's evidence on whether threats of federal prosecution for the Winn Dixie robberies, for which the Defendant had been given immunity, is insufficient to persuade the undersigned that the Defendant's May 4, 2004 statements were voluntary and otherwise comported with the due process of law.

Regarding the first point, it is a matter of logic that if the stop and seizure of the firearm had not occurred on July 9, 2003, there would have been no state case for the U.S. Attorney's Office to exercise its discretion to adopt for federal prosecution, and that but for federal adoption of the state gun charge there would have been no federal indictment in April 2004 or arrest and interrogation in

May 2004. Thus, it is logically undeniable that the unlawful police conduct in July 2003 was the proximate cause of the federal arrest and custodial interrogation almost a year later, that is, that the latter were "fruit" of the former. As such, they likewise must be suppressed. Accord Dunaway v. New York, 442 U.S. 200, 217-19 (1979)(confession should be suppressed unless intervening events break the causal connection with illegal arrest); Brown, 401 F.3d at 597-98 (suppressing statements made following illegal arrest); and United States v. Sanders, 954 F.2d 227 (4th Cir. 1992)(confession not sufficiently purged of taint of illegal arrest to be deemed voluntary).

Second, the intentional and deliberate violation of the Defendant's constitutional rights, by subjecting him to unwarned custodial interrogation at the Charlotte Mecklenburg Law Enforcement Center (by the Newton police officers) set in motion a series of law enforcement actions which culminated in the subject confession. In other words, the unlawful interrogation--the fruit of which the Government has stated it will "self-suppress"--led to the Defendant's agreement to give a statement if but only if he received immunity from prosecution in writing, which led to immunity being obtained and an inculpatory statement being given by the Defendant, which led to statements of some sort by Detective Kyle on May 4, 2004 about the differences in state and federal prosecutions and, undeniably, to the Defendant's confession to two unrelated robberies. Seen in this light, this is little more than a prolonged version of the "question first" strategy condemned by the Supreme Court in Missouri v. Seibert, 124 S. Ct. 2601, 2610 (2004)(post-warning statements inadmissible where intentional and deliberate taking of unwarned statements preceded them). Accord United States v. Washburn, 406 F.3d 303, 305 (4th Cir. 2005)(applying and distinguishing Seibert where agents unintentionally asked "approximately two to three questions" before they realized the defendant had not been advised of his Miranda rights).

10

And third, the May 4, 2004 statements should be suppressed because the Government has not carried its burden of proving by the greater weight of the evidence that the statements were voluntary and otherwise comported with the minimum standards required by the Constitutional guarantee of due process of law. Although a Mirandized statement is deemed voluntary in the absence of some form of coercive police conduct, the Government in this case has failed to meet its minimal burden on this point. Indeed, if the traffic stop and arrest were unlawful, as the undersigned has concluded, and the deliberate and intentional unwarned custodial interrogation set in motion a series of law enforcement actions resulting in the subject confession, as the undersigned has also concluded, then the element of coercive police conduct would appear to be present in this case. Accord United States v. Elie, 111 F.3d 1135, 1143-44 (4th Cir. 1997)("coercive police activity is a necessary predicate to a finding that a statement is not voluntary within the meaning of the due process clause").

Even apart from the Defendant's allegation of threats to prosecute him federally for the offenses which had been immunized from state prosecution--which the Government in this case briefly denied but has by no means persuasively rebutted--the "totality of the circumstances," id. at 1143-44, support the conclusion that the Defendant's May 4, 2004 confession was also involuntary as a matter of law.

### III. RECOMMENDATION

**FOR THE FOREGOING REASONS,** the undersigned respectfully recommends that the Defendant's Motion To Suppress be **GRANTED**.

## II. NOTICE OF APPEAL RIGHTS

The parties are hereby advised that, pursuant to 28 U.S.C. § 636(b)(1)(c), written objections to the proposed findings of fact and conclusions of law and the recommendation contained in this Memorandum must be filed within ten (10) days after service of same. Page v. Lee, 337 F.3d 411, 416 n.3 (4th Cir. 2003); Snyder v. Ridenour, 889 F.2d 1363, 1365 (4th Cir. 1989); United States v. Rice, 741 F. Supp. 101, 102 (W.D.N.C. 1990). Failure to file objections to this Memorandum with the district court constitutes a waiver of the right to de novo review by the district court. Diamond v. Colonial Life, 416 F.3d 310, 315-16 (4th Cir. 2005); Wells v. Shriners Hospital, 109 F.3d 198, 201 (4th Cir. 1997); Snyder, 889 F.2d at 1365. Moreover, failure to file timely objections will also preclude the parties from raising such objections on appeal. Diamond, 416 F.3d at 316; Wells, 109 F.3d at 201; Page, 337 F.3d at 416 n.3; Thomas v. Arn, 474 U.S. 140, 147 (1985); Wright v. Collins, 766 F.2d 841, 845-46 (4th Cir. 1985); United States v. Schronce, 727 F.2d 91 (4th Cir. 1984).

The Clerk is directed to send copies of this Memorandum and Recommendation and Order to AUSA Robert J. Gleason; defense counsel Roderick M. Wright, Jr.; and to the Honorable Graham C. Mullen.

**SO ORDERED AND RECOMMENDED**, this 6th day of December, 2005.

*[Signature]*
**CARL HORN, III**
**U.S. Magistrate Judge**